993 F.2d 1531
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
UNITED STATES of America, Plaintiff, Appellee,
v.
John LAPINSKI, Defendant, Appellant.
 No. 92-1867.
 United States Court of Appeals,
First Circuit.
 May 3, 1993
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND
 John Lapinski on brief pro se.
 Lincoln C. Almond, United States Attorney, and Anthony C. DiGioia, Assistant United States Attorney, on brief for appellee.
 D.R.I.
 AFFIRMED.
 Before Torruella, Cyr and Stahl, Circuit Judges.
 Per Curiam.
 
 
 1
 The appellant, John Lapinski, appeals an order of the district court revoking his term of supervised release and imposing an 18 month term of incarceration. We affirm.
 
 I.
 
 2
 In 1989, Lapinski pled guilty, in the United States District Court for the Southern District of Florida, to one count of knowingly and with intent to defraud possessing fifteen or more unauthorized access devices [credit cards], in violation of 18 U.S.C. § 1029(a)(3). He was sentenced to a 27 month term of imprisonment and a 3 year term of supervised release. Among the conditions applicable to Lapinski's term of supervised release was the standard that, while on supervised release, he shall not commit another federal, state, or local crime.
 
 
 3
 Upon his release from prison, Lapinski moved to Rhode Island and his supervision was transferred to the United States Probation Department there. In 1991, he was arrested and charged with 2 counts of sexual assault in the second degree. In February 1992, Lapinski entered a plea of nolo contendere to the reduced charges of 2 counts of simple assault. He was sentenced to a 1 year term of imprisonment, suspended, and placed on probation for 1 year.
 
 
 4
 Shortly thereafter, at the request of Lapinski's federal probation officer in Rhode Island, jurisdiction over Lapinski was transferred from the Southern District of Florida to the District of Rhode Island where a supervised release violation hearing was held on June 29, 1992. See 18 U.S.C. § 3583(e)(3).
 
 II.
 
 5
 Lapinski was represented by counsel at the violation hearing, where the government presented 2 witnesses and 5 exhibits. The exhibits were (1) a June 12, 1991 criminal complaint report filed by Collene Garafola with the Middletown, Rhode Island Police Department, (2) an August 7, 1991 sworn statement of Ms. Garafola, (3) a certified copy of the judgment of conviction from the State of Rhode Island, (4) a copy of the judgment of conviction from the Southern District of Florida, and (5) a copy of the presentence report in the Florida case. The witnesses were Sergeant Hazel of the Middletown Police Department and United States Probation Officer Kurt O'Sullivan.[1]
 
 
 6
 In the criminal complaint report filed on June 12, 1991, Ms. Garafola recited that, on that day, while walking from Lucy's Hearth[2] to a 7 Eleven store, she saw a man in a car stopped at a light. The man then parked the car and watched her. As she was making a phone call, the man drove his car back to the store, got out, and stood near the glass and watched her. The man then drove away. She reported the license plate number of the car and stated that this same man had been harassing her and several other residents of Lucy's Hearth. She described what he was wearing and reported that he was white, approximately 25-26 years of age, 5'9" tall, thin, with a light complexion, dirty blond hair and blue eyes. She reported that she believed his first name was John.
 
 
 7
 She also reported that this same man had assaulted her outside that same store, four days earlier, on June 8. He ran up behind her, grabbed her by the back of the shirt, and turned her around. He then grabbed her buttocks and put one of his hands up her shirt, touching her breast. She reported that she kneed him in the groin and ran back to the shelter.
 
 
 8
 Sergeant Hazel testified that this complaint was a true and accurate copy of the complaint filed by Ms. Garafola. He also testified that, in investigating this complaint, he interviewed Ms. Garafola and took a sworn statement from her. In the sworn statement of August 7[3], Ms. Garafola reported that, in May 1991, this same man had pulled up in his car while she was walking in the church parking lot and inquired about the shelter. He said that he lived across the street and asked whether there were any single women there who would be willing to move in with him. He asked her name, whether she had a boyfriend or children, and told her that she was beautiful. She walked away. A week later, the man reappeared in his car as she was walking to the shelter. He asked whether she had spoken to any women at the shelter about his offer. Ms. Garafola told him that she had not said anything and left.
 
 
 9
 The sworn statement also described the assault in June. The description of the assault in the sworn statement was, in all respects, consistent with the description of the June 8 assault in the previously-filed criminal complaint. The description of the assailant differed slightly, however. In her sworn statement, Ms. Garafola described her assailant as white, around 6' tall, thin, with medium skin tone, light brown hair, and said that he "might have" blue eyes.
 
 
 10
 In addition, Sergeant Hazel testified that he had run a check of the license plate number reported by Ms. Garafola and it was registered to John Angelico.[4] He presented Ms. Garafola with an array of 6 photographs. He testified that she selected Lapinski's photograph as that of the man who had assaulted her and stated to him that she was 100 percent sure of that fact. In her sworn statement, Ms. Garafola also reported that she was positive that the man in the photograph she selected was the man who had assaulted her.
 
 
 11
 Lapinski's counsel raised no objection to the admission of the June 12 criminal complaint or to the certified copy of the Rhode Island judgment of conviction. He objected to the admission of the August 7, 1991 sworn statement as being stale. That objection was overruled. On cross-examination, Sergeant Hazel conceded that he had not taken Ms. Garafola's original statement of June 12 and Lapinski's counsel highlighted the differing descriptions of the assailant given by Ms. Garafola in her two statements.
 
 
 12
 Lapinski also testified. He stated that he had a common law wife, with whom he had been living for 8 years, and 1 child. He further stated that he recalled seeing a woman in front of the 7 Eleven store in June 1991. She looked like she was crying. He pulled over in his car to talk to her. She said she had a problem with her boyfriend and that she was staying at a shelter. He told her his name and that, if she ever needed anything, he lived across the street. He remained in his car the entire time. The stoplight turned green; he drove away and never spoke to her again. The exchange lasted perhaps 1 or 2 minutes.
 
 
 13
 His counsel further inquired, "Were you trying to pick her up?" Lapinski answered, "Yeah .... well not trying to pick her up so much, but more to, you know to make a friend. I mean, I, you know, try to be friendly with as many people as I can." Lapinski stated that, although he never spoke to her again, she may have seen him because, in addition to living across the street from the 7 Eleven store, he worked in an apartment complex next door to that store and traveled back and forth many times daily. He also testified variously that he was "about 6'2" " and "probably 6'21/2" maybe. Almost 6 feet, close to it." He testified that he pled nolo contendere to simple assault on counsel's advice that he had no other choice, but that he never had any physical contact with Ms. Garafola.
 
 
 14
 On cross-examination, Lapinski testified that, although he recalled speaking to a woman in front of the 7 Eleven store in May, June, or July 1991, he did not recall what she looked like or know whether the incident involved Collene Garafola. He did recall that the road was extremely busy with traffic and that one had to be alert because of cars pulling in and out of the traffic lanes. Nonetheless, he observed a woman looking depressed and leaning against the bus stop on the side of the road.
 
 The following exchange also occurred:
 
 15
 DiGioia[5]: Isn't it true that you've been trying to pick up, if you will, young ladies who lived in that shelter--
 
 
 16
 Lapinski: Well--
 
 
 17
 DiGioia: the better part of the month of May, June, and July?
 
 
 18
 Lapinski: Yes, I talked to a few women on the-in the area, and one other one I found that also lives in the shelter.
 
 
 19
 DiGioia: And isn't it true that you were specifically looking for women who looked like they came from the shelter?
 
 
 20
 Lapinski: No, sir. When I--
 
 
 21
 DiGioia: Isn't it true that you would approach these women and ask them if they would come to live with you just for cooking and cleaning?
 
 
 22
 Lapinski: No, sir. I never asked them to-if they wanted to cook and cleaning [sic].
 
 
 23
 DiGioia: Now, did you every [sic] approach any young lady down there, in that vicinity and ask her to come stay with you, and make a motion down towards, towards your pants, a motion as if to indicate masturbating?
 
 
 24
 Lapinski: No, sir.
 
 
 25
 DiGioia: Never did anything like that?
 
 
 26
 Lapinski: No. Why? That's senseless.
 
 
 27
 DiGioia: That's senseless? Your only approach to these young women was that you were concerned about trying to help them out, is that your testimony?
 
 
 28
 Lapinski: Not concerned about trying to help them out. But, you know, concerned about maybe taking them for a, for a dinner, or for a drink. That's it. I mean I'm not a-in the paper they made it look like a maniac I jump out of a car and I beat somebody up for what reason? I don't understand. What's the-you know, in front of millions of people-not millions of people, but at least hundreds of people in shopping plaza, next door. I don't understand.
 
 
 29
 Lapinski testified that he had no choice but to plead nolo contendere because, he said, his retained counsel would no longer represent him without an additional fee. He never informed the state court that he could not afford counsel. He said that he tried to tell the judge that he wanted to go to trial but could not afford counsel, but that his attorney "kept elbowing me in the side saying, "No. No." " and he never had the chance to tell his side of the story.
 
 
 30
 The district court found by a preponderance of the evidence that Lapinski committed a second degree sexual assault on or about June 8, 1991, in violation of Rhode Island General Laws §§ 11-37-4 and 5 and in violation of the conditions of his supervised release.[6] The court found the "vivid" account of the incident contained in the sworn statement to be credible. Further, Ms. Garafola had described Lapinski and his automobile and had picked out his photograph from the array. The court found not credible Lapinski's testimony that he stopped at the side of the road to comfort and try to make friends with depressed young women. Nor did it find credible Lapinski's suggestion that his nolo contendere plea was involuntary.
 
 
 31
 Pursuant to U.S.S.G. § 7B1.1(a)(2),p.s., second degree sexual assault is a Grade B Violation. With Lapinski's Criminal History Category of IV, the guidelines established a sentencing range of 12 to 18 months. U.S.S.G. § 7B1.4(a),p.s. Based on the evidence, Lapinski's prior history of probation revocation, and its conclusion that Lapinski's testimony was perjured, the district court concluded that a lengthy sentence of incarceration was necessary and ordered that Lapinski be sentenced to an 18 month term of imprisonment.
 
 III.
 
 32
 On appeal, Lapinski claims that evidence of his nolo contendere was improperly admitted and that he should have been allowed to confront and cross-examine Ms. Garafola. These arguments were not raised in the district court. Therefore, as with his contention that Ms. Garafola's August 7 statement was unsworn, supra at note 3, we review only for plain error.
 
 A.
 
 33
 We turn to his claim regarding the nolo contendere plea. Lapinski argues that it was admitted in violation of Fed. R. Crim. P. 11(e)(6).[7] Rule 11(e)(6) of the Fed. R. Crim. P. states, in pertinent part:
 
 
 34
 Except as otherwise provided in this paragraph [not relevant here], evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
 
 
 35
 ...
 
 
 36
 (B) a plea of nolo contendere.
 
 
 37
 Our response is multifold. First, we note that in this case we are dealing with a nolo contendere plea which was entered in state court. And, it may be that, since Rule 11 did not apply in the first instance to the taking of this plea, that provision of Rule 11 purporting to bar its admission also is inapplicable. United States v. Guadarrama, 742 F.2d 487, 489 n.1 (9th Cir. 1984).[8]
 
 
 38
 In any event, the revocation of supervised release does not require a conviction of a separate federal, state, or local crime. Indeed, a violation of the standard condition of supervised release that a defendant shall not commit another federal, state, or local crime may be found whether or not the defendant has been the subject of a separate federal, state, or local prosecution for such conduct. U.S.S.G. § 7B1.1, comment. (n.1). And, the district court did not purport to base the revocation of Lapinski's supervised release on his plea of nolo contendere or resulting conviction. Rather, the district court expressly found that Lapinski committed second degree sexual assault based on Ms. Garafola's sworn statement and its conclusion that Lapinski's testimony to the contrary was not credible. The district court has "broad legal power to determine witness credibility," United States v. Portalla, 985 F.2d at 622, and the evidence cited amply supports the finding, by a preponderance of the evidence, that Lapinski committed second degree sexual assault. Any error in admitting evidence of Lapinski's plea of nolo contendere, whether plain or not, was, at most, harmless.[9]
 
 B.
 
 39
 Lapinski argues that he should have been allowed to confront and cross-examine Ms. Garafola. Fed. R. Crim. P. 32.1(a)(2) (at a revocation hearing, the person on supervised release shall be given, inter alia, the opportunity to question adverse witnesses); see also Morrissey v. Brewer, 408 U.S. at 489 (holding that, at a minimum, due process gives a parolee, at a parole revocation hearing, inter alia, the right to confront and cross-examine adverse witnesses, unless the hearing officer specifically finds good cause for not allowing confrontation); Gagnon v. Scarpelli, 411 U. S. 778, 782 (1973) (applying the minimum due process requirements of Morrissey to one facing the revocation of probation); United States v. Martin, 984 F.2d 308, 310 (9th Cir. 1993) (stating that Fed. R. Crim. P. 32.1 incorporates the Morrissey minimum due process requisites and applies them to a supervised release revocation hearing).
 
 
 40
 Although Lapinski objected to the August 7 sworn statement as stale,[10] he did not complain in the district court specifically of a lack of opportunity to confront and cross examine Ms. Garafola. And, he offered no challenge to the government's explanation that it had not presented Ms. Garafola because it was unable to locate her. On appeal, Lapinski points to the Rule 32.1(a)(2) advisory committee's note, wherein it states that "the probationer does not have to specifically request the right to confront adverse witnesses." Notwithstanding the existence of this right independent of a request, we do not think that Lapinski reasonably can stand mute below and then premise reversible error per se on this ground. We, therefore, shall review this claim for plain error only.
 
 
 41
 We find none. Morrissey and Gagnon (as extended by caselaw to the revocation of supervised release) provide one in Lapinski's position with some right to confront and cross-examine an adverse witness. But, the revocation proceeding is not the equivalent of a criminal prosecution. Morrissey v. Brewer, 408 U.S. at 489. The district court in a supervised release revocation hearing may consider "evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." Id.; see also United States v. Portalla, 985 F.2d at 622 (reciting that the Federal Rules of Evidence do not apply to a supervised release revocation hearing); Fed. R. Evid. 1101(e) (rules inapplicable to revocation of probation). And, "[w]hile in some cases there is simply no adequate alternative to live testimony," Morrissey does not "prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence." Gagnon v. Scarpelli, 411 U.S. at 782-83 n.5.[11]
 
 
 42
 Courts, since the Morrissey and Gagnon decisions, have balanced the right of the parolee or probationer [and we would read here also releasee] to confrontation and cross-examination against the government's reason for denying it. See, e.g., United States v. Simmons, 812 F.2d 561, 564 (9th Cir. 1987); United States v. Bell, 785 F.2d 640, 642 (8th Cir. 1986); United States v. Penn, 721 F.2d 762, 764 (11th Cir. 1983). The government stated that it did not present Ms. Garafola at the revocation hearing because it was unable to locate her. Given her residence at a shelter at the time of the reported incident, this explanation is inherently credible. Indeed, even on appeal, Lapinski suggests nothing which would cast doubt on that statement.
 
 
 43
 We focus, therefore, on the reliability of the evidence which the government offered in place of Ms. Garafola's live testimony. United States v. Simmons, 812 F.2d at 564 (reliability of evidence may provide a basis for its admissibility); United States v. Bell, 785 F.2d at 643 (same); United States v. Penn, 721 F.2d at 766 (same); see also United States v. Portalla, 985 F.2d at 622 (stating that, even though the evidence at a revocation hearing need not satisfy the Federal Rules of Evidence, the evidence nonetheless must be reliable).
 
 
 44
 We conclude that her sworn statement of August 7 bears sufficient indicia of reliability such that its admission into evidence was not plain error.[12] Ad initio, we point out that this sworn statement, no different from an affidavit, is a "conventional substitute[ ]" for live testimony, as recognized by the Court. Gagnon v. Scarpelli, 411 U.S. at 782-83 n.5. Even apart from this, the statement was quite detailed: it related a series of encounters with the same man over a period of months; it provided the name "John" that the man had disclosed during one of these encounters and the license plate number of John Lapinski's car; it recorded Ms. Garafola's identification of John Lapinski from a photo spread; and it recounted with particularity the time, place, and description of the June 8 attack. See Egerstaffer v. Israel, 726 F.2d 1231, 1235 (7th Cir. 1984) (finding that the detail of a hearsay statement is one factor in determining reliability).
 
 
 45
 And, significantly, Lapinski's own admissions corroborated certain of the circumstances recounted in the statement, further supporting its reliability. United States v. Bell, 785 F.2d at 644 (concluding that admissions which sufficiently corroborate police report support that report's reliability); United States v. McCallum, 677 F.2d 1024, 1026 (4th Cir.) (same, report of treatment program coordinator and counselor), cert. denied, 459 U.S. 1010 (1982). To be sure, Lapinski denied the June 8 attack. But, he conceded that he had spent the better part of the months of May, June, and July 1991 approaching women in that same localized area. He conceded that at least one of the women that he had "found" lived at the shelter. And, although he denied knowing whether the incident involved Ms. Garafola, he, in fact, admitted that, in one instance, he had pulled over in his car to talk to one woman he had spotted on the side of the street. Given the district court's broad discretion to decide the reliability of hearsay information, United States v. Portalla, 985 F.2d at 623, we find no plain error and, therefore, no violation of Lapinski's right to confront and cross-examine witnesses, in the admission of the sworn statement into evidence at the revocation hearing.[13]
 
 
 46
 The order of the district court is affirmed.
 
 
 
 [1]
 As Lapinski raises no issues regarding the testimony of Probation Officer O'Sullivan or the admission into evidence of the Florida judgment or related presentence report, we do not discuss them further
 
 
 [2]
 Lucy's Hearth is a shelter for women, located near St. Lucy's Church, in Middletown
 
 
 [3]
 Lapinski insists that this August 7 statement is unsworn. But, Lapinski did not object to the statement on the ground that it was unsworn. "Absent plain error, an issue not presented to the district court cannot be raised for the first time on appeal." United States v. Chaklader, No. 92-1818, 1993 WL 57772, at * 2 (1st Cir. Mar. 10, 1993). Plain errors are those which are " 'particularly egregious' " and " 'seriously affect the fairness, integrity or public reputation of judicial proceedings.' " United States v. Young, 470 U.S. 1, 15 (1985) (citations omitted). The statement, signed by Ms. Garafola, evidences that it was "subscribed and sworn" and contains the signature of Sergeant Hazel as notary public. Sergeant Hazel testified that he reviewed the accuracy of the statement with Ms. Garafola, advised her of the penalties of perjury and the consequences of filing a false police report, and administered the oath to her. This would seem to establish that, in fact, the statement was a swornstatement, despite Lapinski's present objection that it lacked a written recitation thereon that it was signed under penalties of perjury. See Peters v. United States, 408 F.2d 719, 722 (Ct. Cl. 1969) (holding that the absence of the formal requirement of a notarization in sworn affidavits did not invalidate the statements or render them inadmissible since they were actually sworn to before an officer who was authorized to administer an oath and who testified at subsequent hearing to the procedures followed). Thus, there was no error, plain or otherwise, in the characterization of the August 7 statement as sworn and, like both parties and the court below, we shall accept it as such
 
 
 [4]
 It is undisputed that John Angelico is an alias of John Lapinski
 
 
 [5]
 Anthony DiGioia was the government's attorney
 
 
 [6]
 Lapinski pled nolo contendere to the lesser charges of simple assault. However,
 [u]nder 18 U.S.C. §§ 3563(a)(1) and 3583(d), a mandatory condition of probation and supervised release is that the defendant not commit another federal, state, or local crime. A violation of this condition may be charged whether or not the defendant has been the subject of a separate federal, state, or local prosecution for such conduct. The grade of violation does not depend upon the conduct that is the subject of criminal charges or of which the defendant is convicted in a criminal proceeding. Rather, the grade of the violation is to be based on the defendant's actual conduct.
 U.S.S.G. § 7B1.1, comment. (n.1).
 The preponderance of the evidence is the applicable standard for the revocation of supervised release. United States v. Portalla, 985 F.2d 621, 622 (1st Cir. 1993); 18 U.S.C. § 3583(e)(3).
 
 
 [7]
 Lapinski also contends that admitting the evidence of his nolo contendere plea violated the similar provision of Fed. R. Evid. 410 (Inadmissibility of Pleas, Plea Discussions, and Related Statements) and Fed. R. Evid. 803(22) (hearsay exception for judgment of previous conviction entered on plea of guilty, but not upon plea of nolo contendere). The Federal Rules of Evidence do not apply to a supervised release revocation hearing, however. United States v. Portalla, 985 F.2d at 622; see Fed. R. Evid. 1101(e) (rules inapplicable to revocation of probation). We, therefore, need not, and do not, address this contention
 
 
 [8]
 Strictly speaking, Rule 11 prohibits evidence of a plea of nolo contendere. What was admitted at Lapinski's supervised release revocation hearing (without objection, we reiterate) was the state court judgment of conviction. The judgment, however, records that Lapinski was convicted upon a plea of nolo contendere and the government's attorney, at the revocation hearing, also initiated the first reference to the plea in his examination of Sergeant Hazel. Lapinski's counsel, thereafter, referred to it in his examination of Lapinski. Because we conclude that error, if any, in the admission of the evidence of the nolo contendere plea, was harmless, we assume, without deciding, that the admission of the judgment of conviction was, in this case, the equivalent of the admission of evidence of a plea of nolo contendere. But cf. Myers v. Secretary of Health & Human Servs., 893 F.2d 840, 843 (6th Cir. 1990) (holding that Fed. R. Crim. P. 11 and Fed. R. Evid. 410 do not bar the use of a nolo contendere conviction in an administrative proceeding, despite the language in the rules prohibiting the use of a nolo plea in any civil or criminal proceeding)
 
 
 [9]
 Even had the revocation of supervised release been based on Lapinski's state court conviction (and, further assuming that the admission of that state court judgment was not plain error), a challenge to that conviction in this proceeding may well have been inappropriate. "Obviously a parolee cannot relitigate issues determined against him in other forums, as in the situation presented when the revocation is based on conviction of another crime." Morrissey v. Brewer, 408 U.S. 471, 490 (1972); cf. United States v. Paleo, 967 F.2d 7, 13 (1st Cir. 1992) (holding that a defendant may challenge, in a federal sentencing proceeding, the constitutionality of past convictions, offered to increase the length of a present sentence). Even if appropriate, the challenge would be unsuccessful based, as it was, only on Lapinski's self-serving statement, rejected as not credible by the district court, thathis nolo contendere plea was involuntary
 
 
 [10]
 The August 7, 1991 statement recited encounters with Lapinski in May 1991, the June 8, 1991 assault, and a further encounter on June 12, 1991. Counsel's complaint that the August 1991 statement was stale apparently refers not to the interval between May and August of 1991, but to the interval between August 1991 and the June 1992 revocation hearing
 
 
 [11]
 Lapinski claims to be prejudiced from the lack of Ms. Garafola's live testimony because such testimony, he says, is more reliable, i.e., the willingness to testify falsely is impaired when the witness is under oath and in the presence of the accused. The first part of this contention is premised on his companion contention that Ms. Garafola had made no statement under oath. We have rejected that contention, supra at note 3. And, even accepting the preference for face-to-face confrontation, as discussed infra, the government's explanation for her absence at the revocation hearing is credible and unchallenged
 
 
 [12]
 The bulk of Lapinski's argument on appeal appears directed at the August 7 sworn statement. To the extent that his brief reference to the unreliability of police reports is intended as an attack on the admission of the June 12 criminal complaint, it is unavailing. The August 7 sworn statement, apart from a slight difference in the description of the attacker, was entirely consistent with, and essentially replicated, the June 12 criminal complaint. The differences in description were pointed out by Lapinski's counsel at the hearing. Having found sufficient indicia of reliability to support the admission of the sworn statement, there was no plain error in the unobjected-to admission of the essentially duplicative June 12 criminal complaint
 
 
 [13]
 Of course, the reliability of the sworn statement is further buttressed by Lapinski's conviction. Even were we to credit Lapinski's argument against the admission of this conviction, nonetheless, as the text indicates, there were other sufficient indicia of reliability to support the admission of the sworn statement into evidence at the revocation hearing